Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Kimberly S. Fineman (184433)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Tel. (415) 421-2624
Fax (415) 398-2820
sfinestone@fhlawllp.com

Proposed Counsel for Debtor
Professional Technical Security Services, Inc.

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL TECHNICAL SECURITY SERVICES, INC.<br>dba PROTECH BAY AREA,<br><br>Debtor. | Case No. 22-30062<br><br>Chapter 11<br><br>**DECLARATION OF SERGIO REYES, JR. IN SUPPORT OF FIRST DAY MOTIONS AND RELATED RELIEF**<br><br>Hearing Scheduled:<br>Date: TBD<br>Time:<br><br>**Remote appearances only.**<br><br>*Please check www.canb.uscourts.gov for information regarding the Court's operations due to the COVID-19 pandemic* |

I, Sergio Reyes, Jr., declare as follows:

1. I am the Chief Executive Officer of Professional Technical Security Service, Inc. dba ProTech Bay Area (the "Debtor" or "ProTech"). I have served as its CEO since its founding in 1994. I am knowledgeable and familiar with the Debtor's day-to-day operations, business, and financial affairs, and the circumstances leading to the commencement of the Debtor's chapter 11

case (the "Chapter 11 Case"). I am authorized to submit this declaration on behalf of the Debtor. Except as otherwise indicated herein, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor or the Debtor's legal, restructuring, and financial advisors, or my opinions based upon experience, knowledge, and information concerning the Debtor's operations and the local security industry. If called upon to testify, I could and would competently testify to the facts set forth in this declaration.

2. This declaration is submitted to apprise the Court and other parties in interest of the circumstances leading to the commencement of the Chapter 11 Case, and in support of (i) the Debtor's chapter 11 petition and (ii) the motions the Debtor has filed with the Court contemporaneously with the filing of the chapter 11 petition (the "First Day Motions").

**Preliminary Statement**.

3. The Debtor is a privately held, San Francisco-based security company, providing professional security guards and training to Bay Area residential and commercial properties. The Debtor has approximately 500 employees and annual gross revenues in excess of $35 million. The Debtor's revenues and market-share have grown significantly over the last ten years as the security industry went through a period of consolidation. Within the last three years, for example, the Debtor's gross revenues have grown by roughly 10%. Unfortunately, the growth outpaced the company's small business infrastructure and personal tragedy further impacted the business operations.

4. The Debtor fell behind in its payroll taxes and, because of the compounding effects of such missed payments, now owes the Internal Revenue Service ("IRS") in excess of $21 million and the Employment Development Department ("EDD") approximately $2.6 million. These debts represent roughly 90% of all outstanding debts owed by the Debtor. The services provided by the Debtor are in high and increasing demand. The Debtor is well-regarded in the industry and has a significant going-concern value. It simply needs the breathing room to formulate and implement a plan of reorganization, which will include the sale of and/or outside investment in the Debtor's business operations.

**Company Background**.

5. ProTech was founded in June 1994 to provide personalized and professional unarmed security services in high-rise and commercial properties. Since then, ProTech has grown to become one of the largest regional providers of union-affiliated security services in San Francisco Bay Area.

6. ProTech is licensed with the Bureau of Security and Investigative Services ("BSIS") as a Private Patrol Operator. ProTech's guards are specially trained in fire life safety systems, access control applications, CCTV equipment and exceptional customer service. Guards also receive the annual training required by BSIS. In addition to training, ProTech supports its valued guards with high-end professional uniforms and a network of support staff, managers, and field supervisors. ProTech also offers Medic/First Aid, Active Shooter, Floor Warden and Workplace Violence training sessions for its clients.

7. ProTech started with 20 employees, and now has approximately 500 stationed across the Bay Area. Gross revenues were approximately $31.8 million in 2018, $33.3 million in 2019, $36.5 million in 2020, and $35 million in 2021. ProTech's business continues to expand, with current gross revenues of roughly $3 million per month.

**Current Business Operations**.

8. The Debtor's principal office is located at 111 Sutter Street, Suite 550, San Francisco, California. It has a second office located at 1970 Broadway, #940, Oakland, California. As of the Petition Date, the Debtor has approximately 500 employees (the "Employees") serving over 50 standing client accounts. The Employees include security guards, managers, and support staff. Most Employees work on site at a client's premises as guards. Forty-two of the Employees are based out of the Debtor's offices in San Francisco and Oakland. Approximately 446 Employees work as guards on site at the client's location.

9. The guards are covered under a collective bargaining agreement with the local chapter of the Service Employees International Union ("SEIU" or the "Union").

///

///

**Corporate and Capital Structure and its Assets**.

10. The Debtor is a privately held Delaware Corporation. Other than its payroll tax liabilities, the Debtor has very little debt—roughly $500,000 in secured traditional debt and $472,000 in unsecured non-tax debt, primarily to vendors, legal professionals, and some disputed litigation claims.

11. The Debtor's primary asset is its Accounts Receivable, which total roughly $3.4 million monthly. The Debtor also has furniture, fixtures, and equipment in its two leased office locations with an estimated value of roughly $376,000. The Debtor has 12 vehicles used in its business operations, with a total estimated value of approximately $144,000. Another significant asset held by the Debtor is an unused tax Net Operating Loss of almost $9 million. I have been advised the "going concern" value of the Debtor's business is far greater than the liquidation value of its assets, but that "going concern" value is difficult to estimate at this time.

**Events Leading to the Chapter 11 Case**.

12. ProTech's current financial difficulties are a direct result of its rapid growth out-pacing its small-business infrastructure. My recently departed wife, Debra, served as ProTech's Controller from its inception, while I managed the front-end operations. This arrangement worked very well for many years but did not support ProTech's greatly increased scale. To make matters worse, Debra fell terminally ill about four years ago. While she continued to dedicate herself tirelessly to the business, it was a difficult struggle both personally and professionally. When she passed away in October 2019, I was devasted. Oversights and errors made during this very trying time snowballed. One of our problems was that we received payments on our accounts monthly, but obviously needed to pay salaries and the related taxes twice per month. We did not have the financial arrangements with a lender to allow us to handle the cash flow requirements necessitated by the difference between receipts and our monthly cash needs. Payroll tax payments fell short and, by the time we began to regroup, the tax debts and penalties were unmanageable. Of the Debtor's roughly $26.4 million total debt as of the Petition Date, over $21 million (roughly 80%) is attributable to the IRS, with another $2.6 million attributable to the EDD and San Francisco tax

Case: 22-30062    Doc# 6    Filed: 02/01/22    Entered: 02/01/22 20:49:44    Page 4 of 17
FIRST DAY DECLARATION                                                                                    4

authorities. After a $50,000 levy by the taxing authorities, and no end otherwise in sight, ProTech filed this Chapter 11 Case.

**Chapter 11 Exit Strategy.**

13. Through this Chapter 11 Case, the Debtor will develop a plan of reorganization to maximize the return to creditors through the strategic marketing of the business for sale and/or investment. Prepetiton, ProTech retained Generational Equity LLC (a mergers and acquisition advisory firm) to explore these options and anticipates seeking the approval and continuation of such employment during this Chapter 11 Case. I am advised that a sale of the Debtor's assets under Bankruptcy Code § 363 is one option to be explored post-petition. I believe it more likely, based upon my discussions with the Debtor's proposed counsel, that a plan of reorganization in connection with an investment, or a plan followed by a sale by the reorganized debtor, will be the best path forward.

14. To assist in developing this exit strategy, the Debtor will promptly bring applications seeking the Court's approval of the employment of the following professionals:

   a. Finestone Hayes, LLP as the Debtor's general bankruptcy counsel;
   b. Constangy, Brooks, Smith & Prophete, LLP as Debtor's employment counsel to provide ongoing advice on HR issues;
   c. Bachecki, Crom & Co, LLP as the Debtor's accountants; and
   d. Brickell Avenue Consulting LLC, whose principal, David Lefkowitz, has worked with ProTech since roughly December 2018 to address its operational challenges, as the Debtor's Controller.

**Need for First Day Motions.**

15. The Debtor has filed three First Day Motions, relating to the Debtor's transition into chapter 11. The Debtor's advisors believe, and I agree, that the approval of each First Day Motion is a crucial element of the Debtor's reorganization efforts. I have reviewed each of the First Day Motions set forth below, and I believe that the Debtor would suffer immediate and irreparable harm absent the ability to obtain the relief requested in the First Day Motions.

///

///

**Employee Motion**.

16. The Debtor's highly trained Employees are the heart of its business operations. To minimize the impact of this Chapter 11 Case on its Employees, the Debtor has filed a *Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507, and Fed. R. Bankr. P. 6003 and 6004 for Authority to (i) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (ii) Maintain Employee Benefit Programs and Pay Related Administrative Obligations; and (iii) Authorize Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers* (the "Employee Motion").

17. The Employee Motion asks for authority to continue to administer, at the Debtor's business discretion, the Employee Compensation and Benefits Programs in the ordinary course postpetition. The Employee Compensation and Benefits Programs include, among other things, Employee Compensation Obligations, Paid Leave, Health Insurance Plans, COBRA Benefits, Life Insurance, Workers' Compensation Insurance, Short-Term Disability Insurance, and a 401(k) Plan, each as further described below and in the Employee Motion.

18. As of the Petition Date, the Debtor owes approximately $1,971,100 in connection with Employee Compensation and Benefits Programs, excluding any past due Employer Payroll Taxes (the "Prepetition Employee Obligations"). The Employee Motion requests authority to pay an aggregate amount not to exceed $2 million in Prepetition Employee Obligations. The Prepetition Employee Obligations include, in the Debtor's best estimate, the following:

| Employee Compensation and Benefits Programs | Est. Amount Owing from ProTech (excluding Employee contributions) |
|---|---|
| Unpaid Compensation and related Employer Payroll Taxes (approximately $95,000/day gross wages plus $7,400/day taxes for 16 days) | $1,638,400 |
| Payroll Processing Fees | $4,000 |
| Reimbursable Expenses | $0 |
| Health Insurance Plans | $284,000 |
| Life Insurance | $700 |
| Workers' Compensation Insurance | $44,000 |

The Debtor's records confirm that Prepetition Employee Obligations that the Debtor are obligated to pay to, or fund on account of, any individual Employee (excluding the Withholding Obligations, as defined in the Employee Motion) will not exceed the $13,650 priority cap proscribed by the Bankruptcy Code. Most of the Employees are paid based upon an hourly wage, which ranges between $21 and $26 per hour.

19. The Debtor's Employees are paid on a salaried or wages-earned basis through the payroll date. Paychecks are issued bi-weekly—every other Thursday for non-guards and every other Friday for guards. The Debtor uses ADP and Integra Payroll Solutions (collectively "ADP") to administer its payroll. There are twenty-six pay periods per calendar year and payments are initiated through the Debtor's bank accounts maintained at Bank of America. The Debtor's last pay days were January 20 and 21, with a cutoff date of January 15, 2022. The next pay days are February 3 and 4, 2022. The Debtor's aggregate average monthly payroll is approximately $2.7 million or roughly $1.3 million per bi-weekly pay roll. As of the Petition Date, the Debtor expects to owe no more than $1,520,000 on any accrued unpaid prepetition salaries or wages to its Employees, earned between January 16th and the Petition Date. The Debtor pays approximately $8,000 in monthly processing fees to ADP.

20. The Debtor's portion of the additional taxes owing on the Employees' compensation totals roughly $210,000 per month (the "Employer Payroll Taxes"). The Debtor also withholds from Employees' compensation all required federal, state, and local income taxes and Social Security, and imputed taxes owing by the Employees for remittance to the appropriate taxing authorities (collectively the "Employee Withholdings" and together with the Employer Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes, which average about $480,000 per bi-weekly payroll, are calculated and are now remitted to the appropriate taxing authority through ADP.

21. In addition to the Payroll Taxes, the Debtor routinely deducts certain amounts from Employees' paychecks for child support and other garnishments and pre- and post-tax deductions payable pursuant to certain of the Employee Benefit Programs (such as family health insurance contributions and 401(k) plan contributions) discussed in detail below and Union Dues (the

"Payroll Deductions"). The Debtor, through ADP, forwards the Payroll Deductions to the appropriate recipients. On average, the Debtor deducts from Employees' paychecks and forwards through ADP a total of approximately $32,750 per pay period. The bulk of the Payroll Deductions, approximately $28,000 per month, is withheld from the guards' wages for the dues owed to the Union.

22. The Debtor has a policy of reimbursing Employees for reasonable and customary out-of-pocket business expenses incurred for the benefit of the Debtor in connection with their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are historically nominal and all fall within the ordinary business expenses set forth in the Cash Collateral Budget discussed below. Although I am not an Employee of the Debtor (as discussed below), I have also advanced costs on behalf of the Debtor from time-to-time in the course of my role as the Debtor's CEO. I am reimbursed for such expenses in the same manner as the Employees.

23. The Debtor provides paid Vacation to its Employees working more than 1,600 hours per year. Such Employees earn between 5 and 20 days of paid vacation annually after the first year, scaled based upon the number of total years employed. Through the Employee Motion, the Debtor seeks authority to continue these policies and to honor any benefits that accrued prepetition in the ordinary course of business.

24. The Debtor also provides nine paid holidays annually for its salaried Employees and overtime pay on holidays for wage-based Employees. Overtime is paid at a rate of 1.5 times the regular pay or 2 times the regular rate if the holiday is part of the Employee's regular schedule.

25. The Debtor provides medical, dental, and vision insurance for its Employees (the "Health Insurance Programs"). Medical insurance is offered through either Kaiser Foundation Health Plan, Northern California Region ("Kaiser") or Healthy San Francisco ("Healthy SF" and together with Kaiser the "Medical Plans"). The Healthy SF option, operated through the San Francisco Department of Public Health, is remitted through Boon Administrative Services. Benefits vary between the policies, but both provide routine care, hospital care, and prescription drug coverage. The Debtor covers all costs under the medical plan for the Employees. Employees

FIRST DAY DECLARATION                                                                                          8

have the option to add family members to the Medical Plans at the Employee's cost through Payroll Deductions.

26. The monthly cost to the Debtor for the Medical Plans varies based upon the number of Employees subject to each plan and the different payment terms under the policies. The majority of the Employees are covered under a Kaiser plan, with the Debtor paying roughly $1,365,445 annually to Kaiser and $629,845 annually to Healthy SF. Kaiser coverage for the guards, in accordance with the collective bargaining agreement with the Union, is paid in four installments of roughly $220,000 each in the following months January, February, October and December. The balance owing to Kaiser for non-guard employees is paid monthly with each payment being roughly $40,000. Coverage under the Healthy SF plan is also paid monthly with each payment being roughly $53,000.

27. In addition to the Medical Plan, the Debtor also provided dental and vision coverage for its Employees. Dental coverage is provided through Guardian Life Insurance Company of America and covers preventative dental services and basic restorative care. The Debtor provides basic vision coverage to Employees through Vision Service Plan, Inc., as known as "VSP." The annual cost to the Debtor is approximately $45,000 for the Dental Plan and $3,100 for the Vision Plan.

28. As of the Petition Date, the Debtor estimates that the amount of accrued and outstanding prepetition obligations under the Health Insurance Programs is $284,000 or less.

29. The Debtor's required COBRA Benefits are administered through Kaiser. No administrative costs are owed by the Debtor for such COBRA Benefits as all associates costs are paid by the former Employee. The Employee Motion seeks authority to continue the COBRA Benefits in the ordinary course.

30. The Debtor provides group term life insurance to certain qualifying manager Employees through Guardian Life Insurance Company of America. The Debtor's total monthly costs in connection with the Life Insurance are approximately $700. As of the Petition Date, the Debtor owes approximately $700 for accrued and unpaid premiums under the Life Insurance.

31. The Debtor provides Workers' Compensation Insurance for its Employees through Hartford Accident and Indemnity Company. The annual premium for this policy is currently $519,672, which is paid in equal monthly installments.

32. As required by the State of California, Short-Term Disability Insurance (or "SDI") contributions are deducted from each Employee's payroll. The Debtor does not provide or offer additional disability insurance for its Employees.

33. Finally, as to the Employee Motion, the Debtor seeks authority to continue its 401(k) Plan, which is entirely Employee funded. As of the Petition Date, approximately 15 Employees participate in the 401(k) Plan, and the Debtor withholds an average of approximately $6,700 per month in Employee 401(k) contributions. The 401(k) Plan is administered by Standard Retirement Services, Inc., and all management fees in connection with the 401(k) Plan are paid out of the 401(k) Plan's investment classes.

34. The vast majority of the Debtor's Employees rely primarily or exclusively on the compensation and benefits they receive from the Debtors under the Employee Compensation and Benefits Programs to pay their daily living expenses. The Employees and their families would be subject to significant financial hardship if the Debtor could not (i) honor prepetition obligations that may be outstanding as of the Petition Date under the Employee Compensation and Benefits Programs or (ii) continue to administer the Employee Compensation and Benefits Programs without interruption during the pendency of the Chapter 11 Case.

35. Without the relief sought in the Employee Motion, the Debtor might also suffer substantial attrition at a time when the Debtor needs its Employees to perform at peak efficiency. It would be difficult for the Debtor to replace such Employees given the specialized nature of the Debtor's operations and the condition of the Debtor. Consequently, I believe the relief requested is necessary and appropriate. Accordingly, I respectfully ask the Court to grant the relief requested in the Employee Motion.

**Cash Collateral Motion**.

36. The Debtor has also filed a *Motion of Debtor for Order Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363* (the "Cash Collateral Motion"). As of the Petition

Date, the Debtor will have approximately $1.4 million in its bank accounts and $3.4 million in outstanding accounts receivable (collectively, the "Cash Collateral"). While the Debtor currently generates over $3.0 million in accounts receivable each month, the delay in payment by its clients through the standard billing and payment cycle makes access to this Cash Collateral crucial to the Debtor's continued business operations.

37. I am informed and believe three parties hold a security interest in the Debtor's Cash Collateral— (1) City National Bank ("City National"), (2) the EDD and (3) the IRS (collectively the "Secured Parties"). City National's security interest, which the Debtor's records indicate was first in time, arises from a blanket lien securing a business loan to the Debtor with a current balance of approximately $500,000. The EDD has a tax lien in the estimated amount of $2.6 million and the IRS has a tax lien in the estimated amount of $4,042,193. As the EDD and IRS have filed several tax liens, Debtor is uncertain whether these amounts reflect the entirely of the taxing authorities' secured claims, but the claims are at least in these amounts.

38. The Debtor proposes post-petition replacement liens, in the same amounts and priority as the Secured Parties' existing rights in the Cash Collateral (as may later be determined in this case), as adequate protection for the Secured Parties' interest in the existing Cash Collateral. The Debtor also proposes to continue to make monthly payments to City National of roughly $2,550, pursuant to the loan between the Debtor and City National. The proposed monthly payments would pay the accruing interest on the City National debt, but do not reduce the principal.

39. Attached as **Exhibit A** is a proposed budget for the Debtor's operations through June 2022 (the "Cash Collateral Budget"). The Cash Collateral Budget is based upon the Debtor's historic monthly operations for 2021, with what I believe are conservative increases for the new customers the Debtor continues to bring on board and an 8% rate increase effective January 1, 2022. While the growth continues to be substantial, as it has been for several years now, I've also tried to take into account that fluctuations may occur as to existing accounts postpetition. Between 2018 and 2019, the Debtor's gross revenues, as reflected in its tax returns, increased by 4.71%. Between 2019 and 2020, the gross revenues increased again by roughly 9.49%. While the Debtor

anticipates a slight decrease in revenues in 2021, the overall trend the Debtor has seen for at least the last decade is continued growth.

40. The Budget includes a $27,500 per month management fee (the "Management Fee") payable to the Debtor's parent corporation, GAB Holdings, Inc. ("GAB"). I am the sole shareholder of GAB. My compensation for services rendered as the Debtor's CEO is paid exclusively through this Management Fee. Further, I am the only individual compensated through this management fee. This structure has been in place for many years and the Debtor intends to continue with this structure postpetition.

41. The scope of my duties for the Debtor, as its CEO, includes the following:

    a. Communicate with Property Managers regarding business operations, problem solving, and error correction;

    b. Communicate with clients regarding their properties, staffing needs, and new/expanding business opportunities;

    c. Trouble-shoot client issues that property managers are unable to solve, or need help solving;

    d. Interface with department heads relating to Insurance matters, employee benefits, Union contracts and negotiations;

    e. Confirm bank balances and make cash disbursement decisions;

    f. Approve payroll and communicate with the Payroll service manager;

    g. Manager development, individual training and goal setting protocols for department chiefs and their staff;

    h. Hiring assessments and development of innovative solutions for the changing quality of applicants for transition into the security industry; coordinate with HR department and Compliance Officer regarding ProTech's Covid policies in implementation of benefits, health, safety and on-site procedures for our different clients;

    i. Operational collaboration with Ops Team on the transition to a paperless scheduling system along with the Scheduling, Data and Finance departments;

    j. Oversee and coordinate hard assets, process, training, oversight & corrective measures and supportive assistance activities;

  k. Support and guide recently hired managers specific to the Data, HR, Scheduling Compliance and Benefits (who are all less than eight months in their positions); and

  l. Work with Debtor's legal and accounting professionals.

42. If the Cash Collateral Motion is approved by the Court, the Debtor will limit its use of the Cash Collateral to the line items set forth in the Budget, with a permitted variance not to exceed the amount of each category by 10% per line item. I understand that before the Debtor will be allowed to pay an amount in excess of this permitted variance per line item, the Debtor will be required to first get a further order of this Court.

43. I believe allowing the use of the Cash Collateral proposed in the Budget will preserve the position of the Secured Parties, while allowing the Debtor to continue its necessary operations and providing the necessary time to formulate and implement a plan of reorganization as described above.

**Bank Account Motion.**

44. The final First Day Motion is the *Motion of Debtor for Order Authorizing Continued Use of Prepetition Bank Accounts* (the "Bank Accounts Motion").

45. The Debtor's prepetition bank is Bank of America, where it maintains the following accounts (the "Accounts"):

| Account No. | Type of Account | Purpose of Account |
| --- | --- | --- |
| -1925 | Checking | Used of pay ordinary business expenses, primarily online |
| -2808 | Checking | Used to pay ordinary business expenses, including via paper check |
| -2851 | Checking | Used for gas purchases for vehicles |
| -5191 | Checking | Payroll for guard employees |
| -7636 | Checking | Payroll for managers and administrative employees |
| -9492 | Checking | Oakland – local operating account |
| -4827 | Savings | 401(k) Plan |

46. Requiring the Debtor to close the accounts would wreak havoc on its accounting systems, cause considerable disruption in the operation of the business, and adversely impact the Employees.

47. The Accounts are an important part of the Debtor's cash management system. The separate Accounts assist the Debtor in reconciling payments received and allow the Debtor to maintain control of and visibility into disbursements of the company, thereby efficiently monitoring the Debtor's transactions. The Accounts allow the Debtor to separately address various types of payroll and benefit accounts directly impacting Employees. The Accounts also allow the Debtor to separately track different types of business expenses.

48. One immediate reason to maintain the Accounts is that the Debtor's next ordinary payroll is scheduled for February 3rd and 4th, just a few days after the filing of this Chapter 11 Case. The Debtor would not be able to close its existing accounts and open a new account and obtain checks in time for the next payroll run.

49. Additionally, customers often make payments for outstanding invoices by ACH and direct deposit methods and those methods of payment would be disrupted by the requirement to close the Accounts.

50. If the Bank Accounts Motion is granted, the Debtor will monitor the Accounts to make sure prepetition payments are not honored by the bank. The Debtor will work with the bank to identify those outstanding obligations that should be allowed, if the related Employee Motion is granted, and to ensure that any other outstanding payments are not honored postpetition. The Debtor will also request that the bank modify the signature card to provide that the account is a DIP account.

51. In the ordinary course of business, the Debtor uses correspondence and business forms, including letterhead, purchase orders and invoices (collectively, the "Business Forms") which sometimes reference the Accounts. To minimize disruption and unnecessary expense to the estate, the Bank Accounts Motion also asks to permission to continue to use these Business Forms post-petition.

52. Based on my knowledge of the Debtor's operations and on the information contained in this declaration, I believe the relief sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into chapter 11, to avoid immediate and irreparable harm to its business, and is in the best interests of the Debtor's creditors, estate, and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of February 2022 in San Francisco, California.

                                                                                        __/s/_Sergio Reyes, Jr._____
                                                                                        Sergio Reyes, Jr.

# Exhibit A

# Professional Technical Security Services, Inc.
Forecast Profit & Loss
January - June 2022

|  | Jan. 2022 | Feb. 2022 | Mar. 2022 | Apr. 2022 | May 2022 | Jun. 2022 |
|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | |
|   Guard Services | 3,337,985 | 3,354,675 | 3,371,449 | 3,388,306 | 3,405,247 | 3,422,274 |
|     Returns & Allowances | 2,525 | 2,538 | 2,550 | 2,563 | 2,576 | 2,589 |
|   Total Income | 3,335,460 | 3,352,138 | 3,368,898 | 3,385,743 | 3,402,671 | 3,419,685 |
| | | | | | | |
| **Cost of Sales** | | | | | | |
|   Wages | 2,777,667 | 2,701,155 | 2,714,661 | 2,728,234 | 2,741,875 | 2,755,585 |
|   Payroll Tax | 215,269 | 209,340 | 210,386 | 211,438 | 212,495 | 213,558 |
|   Benefits | | | | | | |
|     Health/Medical Insurance | 351,176 | 315,384 | 99,194 | 94,177 | 108,935 | 93,857 |
|   Workers comp | 43,306 | 43,306 | 43,306 | 43,306 | 43,306 | 43,306 |
|   Other Direct Costs | | | | | | |
|     ADP-Payroll Processing | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
|     Automobile/Site Visits | 9,451 | 9,498 | 9,545 | 9,593 | 9,641 | 9,689 |
|     Education | 1,608 | 1,616 | 1,624 | 1,632 | 1,640 | 1,649 |
|     Meals | 1,910 | 1,919 | 1,929 | 1,938 | 1,948 | 1,958 |
|     P/R Tracking Software | 8,038 | 8,078 | 8,119 | 8,159 | 8,200 | 8,241 |
|     Recruiting | 2,915 | 2,929 | 2,944 | 2,958 | 2,973 | 2,988 |
|     Uniform Expense | 18,090 | 18,180 | 18,271 | 18,363 | 18,455 | 18,547 |
| **Total Cost of Sales** | 3,437,429 | 3,319,406 | 3,117,979 | 3,127,800 | 3,157,469 | 3,157,377 |
| | | | | | | |
| **Gross Profit** | (101,969) | 32,732 | 250,919 | 257,943 | 245,203 | 262,308 |
|   *Gross Profit %* | -3.06% | 0.98% | 7.45% | 7.62% | 7.21% | 7.67% |
| | | | | | | |
| **Operating Expenses** | | | | | | |
|   Advertising | 645 | 648 | 651 | 654 | 658 | 661 |
|   Bank Service Charges | 426 | 428 | 430 | 432 | 434 | 436 |
|   Communications | 5,749 | 5,778 | 5,807 | 5,836 | 5,865 | 5,895 |
|   Controller Services | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 |
|   Equipment Rental | 999 | 1,004 | 1,009 | 1,014 | 1,019 | 1,024 |
|   Liability Insurance | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 | 14,210 |
|   Interest Expense | 2,525 | 2,538 | 2,550 | 2,563 | 2,576 | 2,589 |
|   Licenses and Permits | 177 | 178 | 179 | 179 | 180 | 181 |
|   Office Supplies/Expense | 7,594 | 7,632 | 7,670 | 7,708 | 7,747 | 7,786 |
|   Postage and Delivery | 505 | 508 | 510 | 513 | 515 | 518 |
|   Rent | 56,789 | 56,789 | 56,789 | 56,789 | 56,789 | 56,789 |
|   Repairs | 5,025 | 5,050 | 5,075 | 5,101 | 5,126 | 5,152 |
|   Sales & Marketing | 5,477 | 5,504 | 5,532 | 5,559 | 5,587 | 5,615 |
|   Taxes-local | 2,450 | 2,450 | 2,450 | 2,450 | 2,450 | 2,450 |
| **Total Operating Expense** | 111,069 | 111,214 | 111,361 | 111,508 | 111,656 | 111,804 |
| **Operating Income** | (213,038) | (78,483) | 139,558 | 146,435 | 133,547 | 150,504 |
| | | | | | | |
| **Other Income/Expense** | | | | | | |
|   Other Expense | | | | | | |
|     GAB Holdings Inc. Mgmt Fees | 27,500 | 27,500 | 27,500 | 27,500 | 27,500 | 27,500 |
|   Total Other Expense | 27,500 | 27,500 | 27,500 | 27,500 | 27,500 | 27,500 |
|   Net Other Income/Expense | (27,500) | (27,500) | (27,500) | (27,500) | (27,500) | (27,500) |
| **Provision for Income Tax** | - | - | - | - | - | - |
| | | | | | | |
| **Net Income** | (240,538) | (105,983) | 112,058 | 118,935 | 106,047 | 123,004 |
| | | | | | | |
| *Profit as percentage of sales* | -7.21% | -3.16% | 3.33% | 3.51% | 3.12% | 3.60% |

Case: 22-30062   Doc# 6   Filed: 02/01/22   Entered: 02/01/22 20:49:44   Page 17 of 17